IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

BOBBY KIMBLE,

        Plaintiff,

  v.

DR. HOEM,

        Defendant.

OPINION and ORDER

Case No. 17-cv-689-wmc

*Pro se* plaintiff Bobby Kimble, a prisoner at the Wisconsin Secure Program Facility ("WSPF"), is proceeding on an Eighth Amendment claim against defendant Dr. Hoem related to her alleged failure timely to respond to Kimble's complaints about his mental state. Specifically, Kimble claims that Dr. Hoem was deliberately indifferent to his serious mental health need because she failed to respond to his May 22, 2017 request for psychological services until May 26, 2017. Dr. Hoem has filed a motion for summary judgment. (Dkt. 46.) A discussed below, the evidence of record does not support a finding that Hoem was deliberately indifferent to Kimble's request for mental health care. Therefore, I am entering judgment in Dr. Hoem's favor and closing this case.

UNDISPUTED FACTS[1]

I.    **Parties**

At all relevant times, plaintiff Bobby Kimble was incarcerated at the Wisconsin Secure Program Facility (WSPF), where defendant Dr. Stacy Hoem, a licensed psychologist, worked part time. Dr. Hoem's responsibilities included performing mental health screening; conducting brief individual counseling; mental health monitoring; providing crisis intervention and prevention; and providing individual psychotherapy and psychological

---

[1] The following facts are material and undisputed, unless I note otherwise. I have drawn these facts from defendant's proposed findings of fact and plaintiff's response, and the evidence cited in those proposed facts, as necessary.

assessments to inmates needing mental health services. Dr. Hoem worked at WSPF 20 hours per week, spread out over three business days.

## II. WSPF's Handling of Physical and Mental Health Requests

WSPF inmates seeking routine medical or mental health care are to submit a Health Service Request (HSR) to the Health Services Unit (HSU), or a Psychological Service Request (PSR) to the Psychological Services Unit (PSU). Prisoners who need immediate physical or mental health care are instructed to contact security staff (the correctional offices), who then reach out to the appropriate personnel to respond to the reported need. If an immediate response is needed after hours and HSU and PSU staff are not on-site, then WSPF has on-call providers available to address a prisoner's immediate needs.

Incoming HSRs and PSRs are routed to an HSU nurse who conducts an initial processing. The screening nurse triages the requests, then re-routes them to the appropriate department. During triage, if the screening nurse is concerned that an inmate needs immediate mental health attention, then the nurse is to directly contact PSU to expedite a response. If no one is available in the PSU to respond to the screening nurse's report of an immediate mental health need, then the screening nurse is to contact a security supervisor about the prisoner's request. If, during triage, the HSU nurse does not identify an immediate need for treatment, then the screening nurse simply routes the request to PSU for a response in the ordinary course of business.

When the PSU receives PSRs in the ordinary course of business, an office operations associate reviews them. If he is not available, then another PSU staff member reviews the incoming PSRs. Each PSR is assigned to a member of PSU and place in their mailbox. That

staff member then would determine the proper course of action, which could include providing a prisoner with information, scheduling a PSU appointment for the prisoner, or referring the prisoner to some other appropriate resource. When possible, a staff member who has worked with a prisoner in the past will handle his subsequent PSRs. If a prisoner's "assigned" PSU clinician is not available to respond to a PSR, then the PSR is routed to another available staff member. Kimble had an assigned PSU clinician–Ms. Lemieux–but in May 2017, she was out on maternity leave.

### III. Kimble's May 2017 Request for Mental Health Care

In 2016, Kimble was transferred to WSPF after having violently attacked a staff member at his previous institution. Apparently, Kimble went straight into Administrative Confinement (AC), where he remained at all times relevant to this lawsuit. AC is a non-punitive but highly restrictive status for prisoners whom WSPF's security staff have deemed inappropriate for placement in the general population, either because they pose a high risk of violence, or because they pose a threat to institution security. Kimble had been placed in AC because he violently attacked a staff member at a previous institution while in general population.

Prisoners in AC have may attempt to earn their way into WSPF's general population by participating in the High Risk Offender Program ("HROP"). The HROP is organized into three phases – Red, Yellow and Green – that require the inmate to make progress in a number of areas in order to proceed to the next phase. Restrictions lessen as an inmate progresses through each phase. A multi-disciplinary team makes recommendations about phase placement, which then are approved or rejected by WSPF's Security Director and Warden.

PSU staff are involved in HROP placement only to the extent that they may report to the multi-disciplinary unit team any issues or concerns related to an inmate's psychological adjustment and participation in available programming. Kimble went through a review of his placement on a monthly basis and was repeatedly unsuccessful in his efforts to move to the Green phase.

PSU staff share the responsibility of conducting rounds for inmates in WSPF's restrictive housing, includes inmates in AC. During rounds, PSU staff stop and check in with each prisoner to ask if they have mental health concerns or need to speak with someone, and to provide written materials for cognitive stimulation.

As noted above, Kimble was not one of the patients on Dr. Hoem's assigned case load in May of 2017: he was assigned to Ms. Lemieux, who was out on maternity leave at that time.[2] Nevertheless, on May 12, 2017, Dr. Hoem visited Kimble as part of her rounds on his unit in AC. The parties dispute whether Dr. Hoem and Kimble actually interacted at that time: Kimble claims that he was asleep and that no one spoke with him, while Dr. Hoem claims that Kimble was awake, she spoke to him, and he did not report any mental health problems. She noted her version of events in her rounds record. (Ex. 1000 (dkt. 49-1) at 2.)

On Monday, May 22, 2017, Kimble submitted a PSR, writing:

> Dr. Hoem, the reason I write you is due to A.C. getting to me. There are times when Inmates yell like animals. For weeks on end out of their cells & the loudness echo[e]s off the walls constantly. There has also been observation Inmates placed next to me & those guys act deranged. I have been back here in HROP for 10 months with zero conduct, have been on Yellow

---

[2] Kimble points out that on May 8, 2017 he had filed a PSR asking to be placed on Dr. Hoem's "long list." and she responded "Done. I will see you as quickly as I can." Dkt. 49-1 at 6. This is true, but irrelevant: it appears that Dr. Hoem was agreeing to put Kimble on her patient wait list and would become his primary provider as soon as she could. This has nothing to do with Dr. Hoem's four-day delay responding to Kimble's May 22, 2017 PSR directed to Dr. Hoem.

4

> Phase since 09/26/16 & am seeing all Inmates move through HROP. So as you may imagine I'm confused & the environment is getting to me.

(*Id.* at 7.) This PSR was received in the PSU by a part-time office operations associate, Theron Gage. Gage triaged the request; he did not find language indicating that Kimble's PSR needed an immediate response. Therefore, Gage delegated the PSR to Hoem for response.

However, Dr. Hoem was not scheduled to work at WSPF on May 22 or May 23, 2017, and on May 24, 2017 she was participating in an all-day training program at Mendota Mental Health Institute. As a result, Dr. Hoem was not back at WSPF until Thursday, May 25, 2017.

On May 24, the day before Dr. Hoem returned, psychological associate Mink saw Kimble while performing rounds in Kimble's unit. Kimble claims that he spoke with Mink about mental health issues, and Mink told him he should talk to Dr. Hoem, and that she would give Dr. Hoem the message that he wanted to see her. However, according to Mink, Kimble did not report any problems, and her written notes of their interaction show that Mink circled the option on the rounds form "No mental health concerns noted or reported." (*Id.* at 3.) Mink did not give any message to Dr. Hoem from Kimble when Dr. Hoem returned to work.

When Dr. Hoem returned to WSPF on May 25, 2017, she reviewed Kimble's May 22 PSR and decided that she did not need to see him or take further action that day. Instead, Dr. Hoem responded in writing the next day, May 26, that Kimble was scheduled to be seen. (Dkt. 49-1 at 7). In her affidavit, Dr. Hoem provides this explanation:

23. While Kimble did say that the A.C. environment was getting to him, the examples he provided referred exclusively to external factors (excessively loud with undesirable neighbors). He also expressed frustration and confusion about having been on yellow phase for 10 months, with no disciplinary issues, while other inmates moved through the program.

24. I have no ability to influence the physical environment in which Kimble finds himself, that is the responsibility of the security staff and supervisors on his unit.

25. I do not make cell assignments and cannot ensure Kimble has better neighbors.

26. I do not make recommendations or determinations about phase placement in the HROP.

27. Kimble did not complain of internal or other mental health issues in his May 22, 2017, PSR: emotional suffering, sleep disorders, memory problems, depression, stress, anxiety, mental anguish or emotional pain and suffering.

28. I was aware at the time I reviewed this PSR that Ms. Mink had completed rounds in my absence on Kimble's range because we were the only two clinicians available to complete rounds. When I returned on Thursday, Ms. Mink did not report to me that Kimble had expressed any concerns the day before.

(Dkt. 49 at 6.)

Dr. Hoem further stated that she was aware that Kimble was unhappy in the HROP program and frequently complained about it. Accordingly, Dr. Hoem's professional opinion was that Kimble's May 22, 2017 PSR was another instance in which Kimble was complaining about his HROP placement. Dr. Hoem concluded:

30. Because (a) the focus of Kimble's May 22 PSR was on his surroundings and not specific mental health concerns, (b) he had the opportunity to speak with PSU staff after writing that PSR, and (c) based on my previous experience with Kimble, I appropriately scheduled [Kimble] to see PSU.

(*Id.* at 7, ¶ 30.)

While the rounds record from May 30, 2017, show that Mink met with Kimble and reported no mental health concerns, Kimble again claims that no one saw him. However, Kimble agrees that he had an appointment with Lemieux in PSU on June 9, 2017.

On June 24, 2017, Kimble sent a PSR to the attention of Lemieux stating he would like to be put on the clinical monitoring list. On June 26, 2017, Lemieux responded that "you were not taken off of clinical monitoring. Do you want to be seen for an appointment?" (Dkt. 49-1 at 9.) On June 27, 2017, Kimble responded "Yes, please put me on for an appointment to be seen. I'm having problems, restless & can't sleep, overwhelmed." Kimble also reported that he was not getting his Haldol and asked Lemieux to check into this. (*Id.* at 10.)

OPINION

The Eighth Amendment requires prison officials to protect prisoners from substantial risks of serious harm. The Court of Appeals for the Seventh Circuit has held that "prolonged confinement in administrative segregation may constitute a violation of the Eighth Amendment … depending on the duration and nature of the segregation and whether there were feasible alternatives to that confinement." *Rice ex rel. Rice v. Correctional Med. Servs.*, 675 F.3d 650, 669 (7th Cir. 2012). Such risks include the possibility that prisoners will suffer a mental health breakdown, engage in self-harm or commit suicide. *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003). Two elements are required to establish an Eighth Amendment violation: (1) the conditions are sufficiently serious to create a substantial risk of serious harm, and (2) the defendants have acted with deliberate indifference to that risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).

A care provider in a correctional institution is deliberately indifferent only if she knows of and disregards an excessive risk to inmate safety. This state of mind element is measured subjectively. When a prison medical professional is accused of providing inadequate treatment, evidence of medical negligence is not enough to prove deliberate indifference. So, without more, a mistake in professional judgment cannot be deliberate indifference. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). Further,

> By definition, a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that [she] lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Zay v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016). To the same effect,

> To prove deliberate indifference, mere negligence is not enough. A plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm. The linchpin is a lack of professional judgment. A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances. A prison medical professional faces liability only if [her] course of treatment is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment.

*Campbell v. Kallas*, ___ F.3d ___, 2019 WL 3886912 at *7 (7th Cir. Aug. 19, 2019) (emphasis in original, citations omitted).

In this case, Kimble complained in his May 22, 2017 PSR that the constant, echoing din and the deranged inmates next to him were "getting to him," and his failure to advance

8

out of AC for ten months left him "confused." Kimble's report was just barely enough to persuade this court to grant leave to proceed (*see* dkt. 21 at 10), and for summary judgment purposes, I will find that it suffices to meet the first element of an Eighth Amendment violation. But there is no evidence that Dr. Hoem was deliberately indifferent to Kimble's request.

The only inference that reasonably can be drawn from the evidence of record is that Dr. Hoem had a legitimate basis to believe that Kimble's mental health needs were being met when she responded to his PSR. First, Kimble's May 22 PSR had been triaged by another PSU staff member, who had not flagged it as needing immediate attention. Second, another PSU employee – Mink – had reported in the rounds log that she had interacted with Kimble on May 24, 2019, he had accepted a therapeutic puzzle, and no mental health concerns were noted or reported. Kimble now disputes this, but Dr. Hoem could not have known this. She had no reason not to accept as true Mink's written report of her interaction with Kimble, and Mink never passed along any other message from Kimble.

Third, as Dr. Hoem explains in her affidavit, there was nothing in Kimble's May 22 PSR that flagged a need for immediate treatment. His expressed concerns all were external environmental and programming issues, over which Dr. Hoem had no control; Kimble's only reported symptom was that this all was "getting to him." In light of this, Dr. Hoem's May 26, 2017 response – that Kimble was scheduled to be seen in the PSU – cannot reasonably be viewed as deliberate indifference. Fourth, it is now clear that Dr. Hoem did not delay four days in responding to Kimble's PSU. She addressed it the day after she returned from three days out of office. For the reasons already noted, there was no reason for her to have handled it more quickly.

By way of comparison, in Kimble's June 28, 2017 PSR to Lemieux, he reported specific, internal mental health issues: "having problems, restless & can't sleep, overwhelming." This PSR also was triaged as not urgent, and Lemieux responded that she was scheduling a PSU appointment for Kimble in the future. This is exactly the same response that Dr. Hoem provided to Kimble on May 26, 2017, one work day after she first saw Kimble's PSR.

In sum, Dr. Hoem exercised her professional judgment in a logical fashion, taking into account all of the information available to her at that time. There is no indication that she disregarded a substantial risk that Kimble would suffer a mental breakdown or attempt self-harm or suicide. Therefore, I am granting Dr. Hoem's motion for summary judgment. Since I find in her favor on the merits, I need not resolve her alternative argument that she is entitled to qualified immunity.

ORDER

IT IS ORDERED that:

1) Defendant Stacy Hoem's motion for summary judgment (dkt. 46) is GRANTED.

2) The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 26th day of August, 2019.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge